**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.: 19-CR-346 (ABJ)** |
| | : | |
| **v.** | : | |
| | : | |
| **ANDREW ROGERS** | : | **SENTENCING**: March 11, 2020 |
| **Defendant.** | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following memorandum to assist the Court in issuing an appropriate sentence in this case. For the reasons set forth herein, the government recommends that the Court sentence the defendant to a term of incarceration of 324 months (27 years), to be followed by a lifetime of supervised release, with the conditions recommended by the United States Office of Probation, including sex offender assessment and treatment, computer and internet monitoring, and no unsupervised contact with individuals under the age of eighteen. The defendant is also statutorily required to register as a sex offender for a minimum of 25 years. In support of this recommendation, the government relies on the following points and authorities, as well as such other points and authorities as may be cited at the sentencing hearing.

### I.  BACKGROUND

#### A.  Procedural Posture

The charges on which defendant now stands convicted stem from his exploitation of two children as charged in a Complaint on May 24, 2019. On June 4, 2019, the defendant was detained after waiving his preliminary hearing and detention hearing. The defendant entered into a plea agreement with the government.

1

On November 20, 2019, this Court arraigned the defendant on a three-count indictment that charged the defendant with one count of Receipt Child Pornography, in violation 18 U.S.C. 2252(a)(2) and two counts of First Degree Child Sex Abuse, in violation of 22 D.C. Code §§ 3008, 3020(a)(2) in relation to abuse of C-1 and C-2.

After one joint continuance, the Court set a sentencing date of March 11, 2020.

### B.   <u>Statement of Offenses</u>

United States law, Title 18, United States Code 2258A, requires Electronic Communication Service Providers (ECSs) and Remote Computer Service Providers (RCSs), including Internet Service Providers (ISPs) (collectively, "Providers") to report violations of federal laws regarding the sexual exploitation of children.  This law identifies the National Center for Missing and Exploited Children ("NCMEC") as the central repository for these reports.  The Providers generate "CyberTip" reports that they provide to NCMEC when a suspected violation of federal child exploitation laws has occurred. NCMEC analysts then review these "CyberTips" and forward this information to local law enforcement when they are able to determine the identity and/or location of the perpetrator.

The Metropolitan Police Department/Federal Bureau of Investigation Child Exploitation and Human Trafficking Task Force (CEHTTF) received one such CyberTip for a Microsoft Bing user, later identified as the defendant, Andrew Rodgers (herein "RODGERS"), which indicated that the user had downloaded eight images of child pornography to his Bing account.   NCMEC advised in their reports that the images reported had been a "hash match[1]" for known child

---

[1] Microsoft has developed and uses an application called "Photo DNA" to compute and compare known hash values of images, video, and audio files to identify known images of child pornography, each of which are assigned unique hash values. PhotoDNA allows the user to identify known images of child pornography by using an algorithm to compare a suspect image's

pornography, and that an employee of Microsoft had viewed the child pornography before submitting the report to NCMEC.

The CyberTip report indicated that all eight images of child pornography had been downloaded using an internet protocol (IP) address of 207.172.89.165.  The images of child pornography were downloaded between November 12, 2018 and January 5, 2019.  A member of the CEHTTF reviewed the child pornography that had a hash match for known child pornography and found that the Microsoft user had downloaded one image of child pornography eight times during the above-listed times.  The image repeatedly downloaded depicts a Caucasian pre-pubescent boy wearing no clothing except a scarf wrapped around his shoulders. The scarf covers only the child's shoulders, leaving his genitals exposed to the camera. The image depicts a child photographed in a well-documented series of child pornography known to law enforcement and that includes numerous other images of the same pre-pubescent boy depicted naked with his genitals exposed.

The IP address provided by the NCMEC CyberTip as having been used by the Microsoft user to download the child pornography resolved to RCN Telecom Services LLC. An agent with the CEHTTF issued an administrative subpoena to RCN Telecom Services LLC for subscriber information regarding this IP address. The IP address was identified as belonging to RODGERS, with a physical service address of 818 Southern Avenue Southeast, #203, Washington, D.C., 20032.  RODGERS was an active customer of RCN Telecom Services LLC, and had been since November 28, 2015. A phone number of (202) 570-9046 was provided by RCN Telecom Services LLC for RODGERS.

---

unique hash value to the hash values of known images of child pornography and identifying when an image matches a known images. This is identified as a "hash match."

An FBI analyst with the CEHTTF issued an administrative subpoena for the phone number of (202) 570-9046 to Verizon Wireless, which provided subscriber information and historical call records pursuant to the administrative subpoena. Verizon reported that the phone number is currently registered to ROGERS, and the account has been active since July 7, 2010. The account's billing address is 818 Southern Avenue Southeast, #203 in Washington, D.C., 20032.

Agents with the CEHTTF interviewed RODGERS's brother, who indicated that he lives at 818 Southern Avenue Southeast, #203, Washington, D.C., 20032 alone and has since before the time that the images of child pornography were downloaded.  A member of the CEHTTF also ran a criminal records check of RODGERS and found that he is an African-American male with a date of birth of July 17, 1971. RODGERS had a criminal record, including an arrest on January 31, 1997 for a felony child sex abuse charge which resulted in a conviction for a sex offense on May 28, 1997.  RODGERS was required to register a Class B Sex Offender with a 10-year registration period after serving a term of incarceration.

A Deputy United States Marshal (DUSM) of the United States Marshals Service (USMS) was contacted to determine RODGERS's current sex offender registration status. The DUSM reported that RODGERS had been a "Class B" sex offender,[2] and had been registered from 2007 until his registration requirement terminated in 2017.

---

[2] To qualify as a Class B Sex Offender, an offender must have been convicted of, or found not guilty by reason of insanity of, a sex against a minor, that is, a person under the age of 18.

On May 16, 2019, a search warrant was issued by the Honorable Magistrate Judge Harvey of the United States District Court for the District of Columbia (Case no. 2019-SW-183) for the premises of 818 Southern Avenue Southeast, #203.  The search warrant was issued for the recovery of evidence related to the violation of 18 U.S.C. 2252(A).

On May 22, 2019, members of the CEHTTF executed the search warrant at 818 Southern Avenue Southeast, #203.  RODGERS was present in the home at the time of the search, and advised that he was the only resident of the home.  RODGERS was advised at the time of execution of the warrant that he was not under arrest or in custody.  RODGERS was also advised that the CEHTTF was only executing a search warrant at his residence, not an arrest warrant.

RODGERS agreed to a voluntary, non-custodial interview at the time of the execution of the search warrant regarding the downloading of child pornography from his residence. RODGERS was advised that he was not in custody, not under arrest, did not have to speak to the members of the CEHTTF, and could end the interview at any time.  The interview was audio recorded and conducted in a vehicle outside of ROGERS's residence.

RODGERS reported that he resides at 818 Southern Avenue Southeast, #203 in Washington, D.C.  RODGERS reported that he did not have a roommate, and that he had lived in the home for several years by himself.   After being advised of the nature of the search warrant, ROGERS stated that he was in possession of "inappropriate" photographs of children. RODGERS reported that the images were kept on his laptop and cellular telephone, which were located in his bedroom.  RODGERS reported that he had downloaded and saved the images from the internet by visiting websites that included keywords like "boys" or "boy models." RODGERS said that he had possessed some of these images on his devices since 2009. RODGERS stated that he believed that there were ten to fifteen images on his computer.

A member of the CEHTTF described to ROGERS the image of child pornography that had been flagged as a "hash match" by Microsoft, and asked if ROGERS recognized this image described.  ROGERS advised that he believed he did recognize the image, and reported that the photograph was on his devices.

A member of the CEHTTF advised RODGERS that he was aware of his sex offender registration status, and ROGERS's prior conviction for a sex offense against a child.  RODGERS reported that he had served his time regarding his conviction and registration, and advised that he had "turned over a new leaf."  RODGERS reported that he has put in place safeguards to ensure he would not violate the law again, and advised that these safeguards included not babysitting children or working with children.

The CEHTTF members interviewing RODGERS were advised by the search team during the interview of RODGERS that clothes belonging to children had been located inside the home. The interviewers asked RODGERS why he would have children's clothing in the home, and RODGERS advised that he had been babysitting recently.  RODGERS reported that he had, in fact, babysat children the previous day.

RODGERS reported that the children that he babysat are his nephews, a six-year-old male (Herein "W-1) and an eight-year-old male (Herein "complainant #1).  RODGERS reported that he had not engaged in sexual abuse of either child, but said that the children would have their own side of the story to tell.

RODGERS was asked what would happen if he was in an unsupervised place with a male child that he could do anything with, without fear of repercussions.  RODGERS advised that there was a high percentage that "something" would happen.

While RODGERS was being interviewed, members of the FBI Computer Analysis Response Team (CART) conducted a forensic preview of the electronic devices located within RODGERS's home to include a black Hewlett-Packard laptop which was recovered in RODGERS's bedroom.  During the preview, the CART members observed numerous images in the "Pictures" folder under the user name "Andrew Rogers," or a variation of that name.  The examiner advised that some of the images appeared to be child pornography, and asked for a CEHTTF member to review the files.  Members of CEHTTF reviewed the files and observed numerous images of prepubescent children, both clothed or partially clothed.  The images depicted children's genitalia and/or children were engaged in sex acts.

On May 23, 2019, C-1 and W-1 were forensically interviewed at Safeshores located at the Children's Advocacy Center (CAC) in Washington, D.C.  The interviews were conducted with parental consent by trained forensic interviewers as a precaution due to the nature of ROGERS past conviction, his statements during his interview and the nature of the investigation regarding child pornography.

C-1 (an eight-year-old male) advised during the interview that he spent time at his uncle's place.  C-1 reported that his uncle's first name is "Andrew" and his last name is "Rodgers."  C-1 reported that he had gone to his uncle's place for several years, and that he often liked going to his uncle's place.  C-1 reported that sometimes he did not like going to his uncle's place because his uncle "messed with him."  C-1 reported that his uncle would mess with him under the covers while at his uncle's apartment.  C-1 reported that his uncle messed with him in the living room of the home, on the floor near the television.

C-1 disclosed that his uncle would "mess with him" by laying on Complainant #1's back, and putting his weight on him.  C-1 reported that this would make it difficult for C-1 to breathe,

and that it would hurt.  C-1further reported that his uncle would take his "front private part," which he identified as the body part that he goes to the bathroom with, and put it inside Complaint #1's hole on his back.  C-1reported that RODGERS would go too hard and deep when he did this, and that he felt like it would bleed.  The complainant advised that this felt weird inside of him, and that he did not like it.

C-1reported that his uncle had been doing this to him since he was in first or second grade, and that the last time it had happened, C-1was in third grade.  C-1is in third grade now. C-1could not remember the frequency of the sexual assaults, but reported that he had been "messed with" more than two times.

C-1reported that RODGERS was probably a good person at first, and this just started happening out of nowhere.  C-1advised that he had not told his mother because he was afraid she would be mad, and reported that he had not told anyone about RODGERS "messing with him." C-1additionally stated that he was unsure how anyone would know about what had happened to him because he had told no one about it.

W-1 (a five-year-old male) was interviewed forensically at Safeshores separately from Complainant #1.  W-1 reported that he spent time with Complainant #1, his brother, and with several other children that were later identified as half-brothers and half-sisters at ROGERS's house.  These other children were later identified by law enforcement as children that RODGERS babysat.  W-1 did not make any disclosures of sexual abuse or being a witness to sexual abuse.

Two additional children identified as having been babysat by RODGERS, a six-year-old female (herein "Witness #2) and a nine-year-old female (herein "Complainant #2"), were subsequently forensically interviewed at the CAC by a Safeshores forensic interviewer.  C-

9

2reported during the forensic interview that she has a younger sister, Witness #2, and other related siblings, to include C-1and W-1.  C-2 offered that she was being interviewed because of Andrew, who she later identified verbally as her uncle, Andrew Rodgers.  C-2 reported that her mother had asked her recently if RODGERS had touched her.[3]  C-2 told her mother that RODGERS had not touched her.  However, the following day before the forensic interview was conducted, C-2 decided to disclose to her mother that RODGERS had, in fact, touched her.  C-2 told the interviewer that she had not told her mother initially because she did not want people to think RODGERS was a bad person, and did not want people to think her mother could not take care of her.

C-2 disclosed during the interview that RODGERS would touch her "private part" with his hand under her clothes, and on her skin.  C-2 identified her private part as "the place that people use to go to the bathroom."  C-2 then stated that RODGERS would penetrate her butt with his "private part," which she also identified as "the place where people pee from."  C-2 said that RODGERS body would move like a "wave" that was pushing on her back and bottom.

C-2 reported that the touching and penetration would occur in the living room of RODGERS's home.  C-2 said that they would be sitting on a couch in the living room when the assaults occurred.  C-2 disclosed that she felt like she could not do anything because "he wasn't listening to me" and "he wouldn't stop."  C-2 stated that all of the sexual assaults occurred when she was nine years old.

---

[3] C-2's mother was made aware of the interviews of C-1 and W-1 by a mutual family member and asked C-1 the day before the forensic interview if ROGERS had done anything to her.

## II.    SENTENCING CALCULATION

### A.    Statutory Penalties

Each offense of Receipt of Child Pornography, in violation of 18 U.S.C. § 2252(a) (2) and carries a mandatory minimum sentence of 15 years imprisonment and maximum sentence of 40 years imprisonment; a fine of up to $250,000; a term of supervised release of not less than 5 years up to life; and a mandatory restitution order under 18 U.S.C. § 3633A. See PSR p. 1.

Each offense of First Degree Child Sexual Abuse with Aggravating Circumstances, in violation of 22 D.C. Code. §§ 3008, 3020(a) (2) and (5), carries a maximum sentence of lifetime imprisonment and a fine of up to $125,000.  See id at 2.

Pursuant to 18 U.S.C. § 3013(a)(2)(A), there is a mandatory $100 special assessment fee for each felony conviction payable to the Clerk of the United States District Court for the District of Columbia.

### B.    Guidelines Ranges

#### 1.   Federal Charges

The guidelines for Count 1 is calculated pursuant to the United States Sentencing Guidelines ("U.S.S.G."). The presentence report writer calculated the defendant's Guidelines Sentencing Range for Count 1 as a base offense level of 22, pursuant to U.S.S.G. § 2G2.2(a)(2). See PSR at ¶41. The PSR writer applied five specific offense characteristics: (1) the offense was limited to receipt of child pornography (-2) Id. at ¶ 42; the images involved a child who had not attained the age of 12 (+2) Id. at ¶ 43; the pattern of activity involved the sexual exploitation of a minor (+5) Id. at ¶ 44; the offense involved the use of a computer or an interactive computer service (+2) Id. at ¶ 45; and the offense involved more than 600 images of child pornography  (+5). Id. at ¶ 46. The adjusted offense level for Count 1 is 34. Id. at ¶ 54.

The presentence report writer calculated the defendant's DC Voluntary Guidelines. The guidelines classify Counts 2 and 3, First Degree Child Sex Abuse with Aggravating Circumstances as a Group M3 Offence under the DC guidelines Id. at ¶ 56.

In addition, the defendant is a Repeat and Dangerous Offender against Minors under U.S.S.G. § 4B1.5 (b) (1), and therefore five additional levels could be added. Id. at ¶ 51. However, the offense level determined under § 4B1.5 (a) (1) (B) (ii), 34, is the greatest and applicable offense level because the statutory maximum term of imprisonment is 25 years or more. Id. at ¶ 51.

The government agrees with the PSR that, under the federal sentencing guidelines, the defendant has a criminal history score of three. See PSR at ¶ 59. However, the defendant is a repeat and dangerous sex offender against minors therefore his criminal history category is determined und Chapter For, Part B, or criminal History Category V. See PSR at ¶ 60.

With an offense level of 31 and a Criminal History Category of V, the defendant's sentencing guidelines range for Count 1 is 180 (the mandatory minimum) – 210.

**2.  D.C. Code Charges**

Under the D.C. Voluntary Sentencing Guidelines, the defendant's criminal history score is 2, which puts defendant in Criminal History Category C. See PSR at ¶ 62.

The United States agrees with the PSR writer that, with a Criminal History Category C, the applicable sentencing guidelines range under the District of Columbia Voluntary Sentencing Guidelines for Counts 2 and 3, is 114-136 months incarceration.

**III.  GOVERNMENT'S RECOMMENDATION**

**A.  Application of the Federal Sentencing Guidelines**

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). As a consequence, the

Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1).  Booker, 125 S. Ct. at 756.

In post-Booker cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable guidelines range. See United States v. Gall, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.").  After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).  Id.  These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

### B.   Basis for the Government's Recommendation

Given the particular circumstances of this case, the government submits that a sentence of 324 months (27 years) incarceration, lifetime supervision, and the specific conditions of supervision recommended by the United States Office of Probation, is appropriate and warranted. There is no reason given the defendant's conduct and the facts and circumstances of this case, that the defendant here merits a sentence outside the heartland of the guidelines.  That said, the sentence

that the Court may impose on any one of the federal charges here is limited by the statutory maximums.  Given the ongoing nature of the defendant's conduct, the fact that he committed multiple, distinct federal offenses, and the fact that he sexually abused two separate child victims, the United States believes that the Court should impose a sentence of 15 years for the federal offenses involving receipt of child pornography, and, to address the separate harms inflicted on each victim as a result of defendant's sexual abuse, consecutive terms of imprisonment of 12 years' incarceration for the sexual abuse of C-1 and 12 years for the sexual abuse of C-2, but run those sentences concurrent to one another.  The requested 12 years (144 months) of incarceration is the bottom of the sentencing guidelines for the First Degree Child Sexual Abuse with Aggravating Circumstances.

### 1.      The Nature and Circumstances of the Offense

A significant sentence is warranted because the defendant's conduct in this case was calculated and nothing short of predatory.  The defendant took advantage of the access he had to children as a baby sitter and an uncle.  It was through his position as a trusted fraternal figure – a permanent fixture in their lives– that the defendant was able to gain a position of trust and the power that he premeditatedly exploited as a means to gratify his own sexual desires.  He not only victimized these two children in their most formative years, causing permanent harm to them.

The defendant's repeated sexual assaults of C-1 and C-2, standing alone, are deserving of serious punishment, but those assaults did not occur in a vacuum.  For the years the defendant cared for the children as their babysitter, the defendant manipulated their families into thinking that his home was a safe space.

In a place where they should have felt protected, the defendant instead preyed upon them, leaving C-1 and C-2 in constant fear and anticipation of the next time they would be victimized.

Because the defendant wanted to – and did – use them for his sexual gratification at will, two children were required to conceal his behavior from their parents to try and protect the defendant because they were confused by his actions, noting that he was "so nice," too young to even understand the vileness of the defendant's behavior.

Given the defendant's conduct in this case, which fits into a larger pattern of conduct as described below, a sentence as recommended herein is appropriate and warranted.

### 2.      The Defendant's History, Characteristics, and Cooperation

The recommended sentence takes account of the fact that the defendant has previously engaged in hands on sexual abuse of a child. Further, evidence collected from the defendant's device reveal that he stored several hundred child sexual abuse images.   Moreover, the defendant characterized his admitted abuse of C-1 [which he described as rubbing his penis against his nephew's buttocks] as was the most serious he ever committed, without acknowledging his conduct against C1 and C2 involved penetration.  The defendant's responses in the PSR interview indicate he lacks the insight into his own behavior, understanding of its wrongfulness, and contrition to participate meaningfully in any rehabilitative programs.   As a result, he would undoubtedly continue to be a danger to the community whenever released even though he accepted responsibility for a portion of his actions in this case by taking a plea.

### 3.      Punishment, Deterrence, Protection, and Correction

A sentencing court "shall impose a sentence sufficient, but not greater than necessary" to comply with the need for a sentence: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a) (2).

The government's recommended sentence is sufficient, but not greater than necessary in the context of this particular case. The defendant's conduct, as well as the surrounding relevant conduct, have inflicted extreme harm to the victims and their family. The community, and most especially vulnerable young children like the victims, must be protected from the kind of ongoing, premeditated, abusive conduct engaged in by the defendant. The crimes committed by the defendant warrant incapacitating him for a long period of time not only to protect society, but also to punish him appropriately for his conduct.

A lesser sentence would fall short of deterring the defendant from future criminal conduct. Moreover, a requirement of lifetime supervision, with specific conditions recommended by the probation office, is crucial to ensuring individuals in whatever community ultimately hosts the defendant upon his release are protected. Lifetime supervision will also provide the defendant with the opportunity to receive the treatment that he needs, should he change course and decide to accept it, to ensure that he does not commit similar offenses in the future.

### 4.  <u>Available Sentences</u>

Given the guidelines range applicable to the defendant, he should be sentenced to a term of incarceration at the bottom of the guidelines as agreed in the plea agreement. The defendant is in Zone D of the Guidelines, and thus he is not eligible for a probationary sentence.

In addition, the Court should impose a lifetime term of supervised release, which is appropriate to ensure the defendant's participation in sex offender treatment and, most critically, to safeguard the community through ongoing monitoring. The government believes that the defendant's conditions of release should include the statutorily required sex offender registration and computer search and monitoring. The defendant used electronic devices to receive and retain

images of child pornography.  The defendant's known sexual interest in minors and his extensive use of electronic devices to obtain and store explicit images of children justifies monitoring his future use of electronic devices.

In addition, the defendant's relevant conduct in this case expands far beyond that to which the defendant has pled.  Given the pervasiveness of defendant's conduct, the government also requests that the defendant be required to undergo sex offender assessment and treatment, as well as a polygraph examination, to appropriately identify the defendant's needs and risks of reoffending.  Given the nature of the totality of defendant's relevant conduct and his hands-on abuse of C1 and C2, it is clear that the defendant has a sexual interest in minors, and thus these measures are prudent and appropriate.  Although the assessment would deprive the defendant of some liberty, that deprivation is more than reasonably necessary to achieve the statutory objective of providing treatment.

### 5.     The Sentencing Guidelines and the Commission's Policy Statements

In December 2012, the Sentencing Commission submitted a report to Congress concerning the Guidelines for child pornography offenses.  ("The CP Report.").  The CP Report was released to the public in February 2014 and contained numerous observations that are relevant to a sentencing judge, with a primary focus on *non-production* offenses.  However, the CP Report did recognize what is at the forefront of this case:  all child pornography offenses inherently involve the sexual abuse and exploitation of children.  The CP Report further emphasized that many victims suffer lifelong harm at knowing that their images are being used by offenders for sexual gratification.

With regard to federal production offenses, the CP Report found that sentencing has been less controversial than in non-production cases.  See CP Report at 247.  The number of production cases has grown substantially, from only ten cases in 1992 to 207 cases in 2010.  Id.  Statutory

17

penalties, guidelines ranges, and average sentences have likewise grown at a significant rate. According to the CP Report, in fiscal year 2010, the average prison sentence for production offenders was over 22 years (269.1 months.)  Id. at 268.  In 2010, the "within range" rate for production cases was 56.8%, while the below range rate (excluding substantial assistance departures) was 35.9%.[4]  Id. at 254.  The CP Report further noted that a significant number of sentences (40.5% in fiscal year 2010) at or above the middle range of the applicable guidelines range.  The CP report also noted that, like this case, the majority of production cases had a single victim.  Id.

The recommended sentence here falls well within the statistical norm of these cases, thus avoiding unwarranted sentencing disparities.

In addition, the sentence recommended by the government is one that is in line with relatively comparable cases recently sentenced in this courthouse.  For example:

- In United States v. Rolando De La Rocha, 15-CR-94 (Boasberg), De La Rocha pled guilty pre-indictment to one count of Production of Child Pornography and one count of First Degree Child Sexual abuse under the D.C. Code for repeatedly filming himself performing oral sex on his girlfriend's 12-year-old daughter.   The defendant accepted full responsibility for his conduct, pled guilty early, and was sentenced to 22.5 years incarceration.

- In United States v. Eric Toth, 13-CR-313 (Contreras), Toth pled guilty before indictment to three counts of Production of Child Pornography and identity-theft related offenses.  Toth, a third-grade teacher, produced and possessed child pornography in Washington,

---

[4]     The "below range" rate includes government sponsored departures for reasons other than substantial assistance.

D.C., and Maryland involving students at the school.  Pursuant to Rule 11(c)(1)(C), Toth was sentenced to 25 years incarceration and a lifetime of supervised release.

- In <u>United States v. Andre Drew</u>, 07-007 (Kessler), the defendant was convicted after trial of sexually abusing and producing child pornography using two young boys ages 8 and 13. The defendant had two prior convictions for sexually assaulting underage boys.  The defendant was sentenced to 543 months (45.25 years), consecutive sentences to account for the two victims he abused.

While these cases are instructive as points of reference, each differs in significant ways from the instant case.  Toth engaged in egregious acts of sexual abuse and production of child pornography.  But the Toth case is similar to the defendant insofar as Toth accepted responsibility for and entered guilty pleas for his conduct at the earliest stages, before indictment, sparing the young child victims the trauma of testifying at trial.

### 5.    Restitution

The victims' family have been advised of their right to seek restitution in this case and, at this time, have not requested restitution.  Should the government receive a request for restitution between the date of this filing and the end of the 90-day statutory period post-sentencing during which the Court may make a final determination of any victim's losses pursuant to 18 U.S.C. § 3664, the government will submit  that restitution request to the Court.

IV.     **CONCLUSION**

WHEREFORE, for all of the reasons set forth herein, the government recommends that the Court sentence the defendant to a term of imprisonment of 540 months, to be followed by a lifetime of supervised release, with the recommended conditions of supervision.  The government also recommends that the Court require the defendant to register as a sex offender for the statutorily required period.

Respectfully submitted,

TIMOTHY SHEA
UNITED STATES ATTORNEY

/s/ *Kenya K. Davis*
Kenya K. Davis, D.C. Bar 502305
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7059
Kenya.Davis@usdoj.gov

<u>Certificate of Service</u>

I hereby certify that I have caused a copy of the foregoing to be sent by email to counsel for the defendant, Joanne Slaight, this 24th day of February, 2020.

/s/*Kenya K. Davis*_____
Kenya K. Davis
Assistant United States Attorney
D.C. Bar 502305
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7059
Kenya.Davis@usdoj.gov